UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
SOUTH BEND DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA ) | |
| ) | |
| v. ) | Case No. 3:16-CR-094 JD |
| ) | |
| PRESLEY BROWN ) | |

**OPINION AND ORDER**

Defendant Presley Brown is charged with one count of possessing a firearm as a felon. He was arrested on a warrant when officers spotted him riding as a passenger in his girlfriend's car. A search of the car revealed a firearm below his seat and led to the seizure of his cell phone. Officers later obtained a search warrant for the phone, which contained videos of Mr. Brown possessing firearms. After Mr. Brown's girlfriend signed a consent to a search of her house, officers also conducted a search there, where they found additional firearms that Mr. Brown is alleged to have possessed. Mr. Brown has now moved to suppress all of that evidence, arguing that the warrantless searches of the car and his girlfriend's house were unlawful, and that the warrant for the search of his phone was invalid. For the following reasons, the Court denies the motion as to the searches of the car and the phone, but grants the motion as to the search of the house.

**I. FACTUAL BACKGROUND**

On November 9, 2016, Presley Brown had an active warrant for his arrest, and he was a person of interest in a recent homicide. Homicide detectives wanted to speak with him, so officers on the South Bend Police Department's Strategic Focus Unit began searching for him to arrest him on the warrant. In preparing to look for Mr. Brown, the officers confirmed that he was a convicted felon, and they also found pictures on a social media site showing him with firearms. The officers found Mr. Brown just after 5:00 p.m., as he was riding as a passenger in a car driven

by his girlfriend, Dominique Brown.[1] The officers initiated a traffic stop to arrest Mr. Brown on the warrant. The car pulled over, officers approached on both sides of the car, and they immediately ordered Mr. Brown out of the car. He complied, though he tossed his cell phone back into the car just before the officers began frisking him. While that was going on, the officer on the driver's side asked Dominique for her identification, and then directed her to step out of the car. She complied as well, and the officer informed her that the reason she was pulled over was that they had a warrant for Mr. Brown's arrest. After searching Mr. Brown and securing him in handcuffs, an officer led him back towards the police cars. Another officer radioed in Dominique's identification to confirm her driving status, and after a brief delay, learned that Dominique had a learner's permit, meaning she could not drive on her own.

Another officer then asked Dominique if there was anything in the car they should know about. Though her response is not audible in the recording, the Court finds that she told the officers that there was a gun in the car, as explained in more detail below. The officers asked where in the car, and thanked her for her honesty. One of the officers then explained that they were going to photograph everything, and also told Dominique that they needed to take a statement from her. She asked to retrieve her cell phone, but the officer told her the officers were going to go into the car first, and that he couldn't allow her to make phone calls at that point. Dominique was then led to and placed in the back seat of one of the officers' cars. Several minutes later Dominique signed a written form consenting to a search of her car, and officers seized the firearm and the cell phone from the car.

---

[1] The Court refers to Ms. Brown as "Dominique" to avoid confusion, as she and the defendant share the same last name.

Dominique was then driven to the police station, where she was placed in an interrogation room after a detective took her purse and cell phone from her. Two detectives spoke to her for about forty-five minutes before they drove her to pick her mother up from work, after which they drove straight back to the station and placed her in the same interrogation room. At that point, Dominique confirmed that a picture showing Mr. Brown with a firearm was taken in her house. Accordingly, the detective told her that they wanted to search the house, and Dominique signed a written consent form consenting to the search. Dominique was then brought back to her house, where a number of officers conducted the search. They found a variety of evidence, including an AK-47 rifle, a pistol, and ammunition. That same evening, a state prosecutor applied for a search warrant for the cell phone recovered from the car, based on information provided to him by the officers. The warrant was issued, and a search of the phone revealed videos of Mr. Brown posing with several guns.

## II. DISCUSSION

Mr. Brown moves to suppress all of the evidence recovered through the searches of the car, the cell phone, and the house. The Court considers the legality of each search in turn.[2]

**A.   Search of the Car**

Mr. Brown first argues that the search of the car was unlawful, and that the firearm and cell phone should be suppressed as the fruits of that search. The parties dispute a number of issues relative to the search of the car. The government argues that Mr. Brown was a mere passenger in the car, and thus lacks standing to object to a search. Mr. Brown disagrees, and

---

[2] At the Court's direction, the government filed a notice following the suppression hearing containing the time stamps of the portions of Mr. Brown's interview to which it referred during the hearing. Mr. Brown objected to that filing, arguing that it contained commentary and characterizations beyond what the Court asked for. To be clear, the Court has reviewed the entirety of each of the recordings submitted as exhibits, and has relied on the recordings themselves for their content, not either party's description of them.

further argues that Dominique's consent to a search of the car was not effective because it was not voluntary and occurred after the search had already begun. The Court need not resolve any of those disputes, though, as the officers plainly had probable cause to search the car, so the motion can be denied on that basis alone.

A warrantless search is per se unreasonable under the Fourth Amendment unless one of a few well-established exceptions applies. *Arizona v. Gant*, 556 U.S. 332, 129 (2009); *United States v. Zahursky*, 580 F.3d 515, 521 (7th Cir. 2009). "One such exception to the warrant requirement is the automobile exception, which allows law enforcement to conduct a warrantless search of a vehicle if there is probable cause to believe the vehicle contains contraband or evidence of a crime." *United States v. Williams*, 627 F.3d 247, 251 (7th Cir. 2010). Probable cause to search exists where, based on the known facts and circumstances, a reasonably prudent person would believe that contraband or evidence of a crime will be found in the place to be searched. *United States v. Edwards*, 769 F.3d 509, 514 (7th Cir. 2014).

Here, the officers had probable cause to believe that Mr. Brown was committing the crime of possessing a firearm as a felon, and that the car contained evidence of that crime: a firearm. First, prior to arresting Mr. Brown, the officers had reviewed his criminal history and confirmed that he was a convicted felon. They also conducted research on the internet and found pictures posted on a social media site showing Mr. Brown with firearms, which gave them cause for concern that he might be armed. In addition, after the officers arrested Mr. Brown, they spoke to Dominique, who told them that Mr. Brown had a firearm under his seat. Though Dominique testified that she did not recall offering that information, Officer Graber testified that she told him that Mr. Brown had a gun under his seat, and the video corroborates that testimony. One of the officers can be heard explaining to Dominique that he had dealt with Mr. Brown in the past,

4

and he asks Dominique if there is anything in the vehicle that she needs to tell the officers about. Dominique's response was not captured by the audio recording, but the officers immediately respond by asking, "In the car? Where at in the car?" Again, Dominique's response is inaudible, but the officer responds by saying, "That's fine, I appreciate your honesty," and he then tells her that the officers were going to go in the vehicle and photograph everything. This exchange is consistent with and corroborates the testimony that Dominique told the officers that Mr. Brown had a firearm under his seat. Thus, given that statement by Dominique, there is no question that the officers had probable cause to search the car for evidence that Mr. Brown unlawfully possessed a firearm.

In resisting that conclusion, Mr. Brown argues that Dominique was unlawfully detained at the time she made that statement, and that officers thus cannot rely on her statement in support of probable cause to search the car. This argument fails for two reasons, though: Mr. Brown does not have standing[3] to object to an unlawful detention of Dominique in this context, and Dominique was not unlawfully detained at that point, either. First, in arguing that officers could not rely on Dominique's statement in support of probable cause, Mr. Brown is essentially arguing that her statement and the resulting probable cause were the fruit of the poisonous tree of her unlawful detention. However, "Fourth Amendment rights are personal rights that may not be asserted vicariously." *Rakas v. Illinois*, 439 U.S. 128, 134 (1978). Dominique's detention, whether lawful or not, did not implicate any of Mr. Brown's personal rights under the Fourth Amendment. Accordingly, he cannot object that the probable cause to search the car was lacking

---

[3] As used in this context, the term "standing" has a different meaning than when used in the jurisdictional context; it refers to a substantive component of the Fourth Amendment analysis that requires a defendant to show that his own Fourth Amendment rights were violated. *Minnesota v. Carter*, 525 U.S. 83, 87–88 (1998).

because it was procured through a violation of someone else's rights. *See United States v. Washburn*, 383 F.3d 638, 643 (7th Cir. 2004) (holding that a defendant could not object that the probable cause for a search was procured through a prior unlawful search of someone else's vehicle); *see also United States v. Davis*, 750 F.3d 1186, 1190–91 (10th Cir. 2014) (holding that, even if a defendant had standing to argue that he was illegally seized during a traffic stop, he could not object that the probable cause for that stop was procured through a prior unlawful search for which he lacked standing to object).

Second, Dominique was not unlawfully detained at the time she told the officers about the firearm in the car. Mr. Brown argues that because the only reason for the stop of the car was to arrest him pursuant to a warrant, officers were obligated to send Dominique on her way the moment he was removed from the car. The Court disagrees. As Mr. Brown notes, "a seizure that is lawful at its inception can violate the Fourth Amendment if its manner of execution unreasonably infringes interests protected by the Constitution." *United States v. Muriel*, 418 F.3d 720, 725 (7th Cir. 2005). Thus, "the detention following a traffic stop . . . must be reasonable." *Id.* However, "[a]n officer conducting a valid traffic stop can detain the occupants of the vehicle long enough to accomplish the purpose of the stop." *Id.* "And, as part of the stop, police may ask the vehicle's occupants 'a moderate number of questions' and request their identification." *Id.* (quoting *Berkemer v. McCarty*, 468 U.S. 420, 439 (1984)).

That is exactly what happened here. First, there is no question that the stop of the car was valid, as officers had a warrant for Mr. Brown's arrest and recognized him as an occupant in the car. Once the car was stopped, as Mr. Brown was being searched and placed in handcuffs next to the car, an officer directed Dominique to step out of the car. That was reasonable, as officers are entitled to order occupants out of a vehicle "'as a matter of course' during a traffic stop." *Id.* at

726 (quoting *Maryland v. Wilson*, 519 U.S. 408, 410 (1997)). After Mr. Brown was secured and led away from the vehicle, an officer radioed in Dominique's identification to verify her driving status. The officer then learned that Dominique only had a learner's permit, meaning it would have been unlawful for her to drive away by herself, without a licensed driver in the passenger seat. Thus, she could not have simply driven away, contrary to Mr. Brown's initial argument. *See United States v. Fadiga*, 858 F.3d 1061, 1063 (7th Cir. 2017) (holding that a traffic stop was not unreasonably prolonged where the occupants could not lawfully drive away in the car).

At that point, another officer began asking Dominique whether anything was in the car that they needed to know about, as just noted. Again, that was permissible, as "the police may ask questions that do not concern the purpose of the stop and that are not supported by any other suspicion." *Muriel*, 418 F.3d at 726; *see also Arizona v. Johnson*, 555 U.S. 323, 333 (2009); *United States v. Brown*, 355 F. App'x 36, 38 (7th Cir. 2009) ("[T]he reasonableness of the detention is the constitutional touchstone, and police properly may ask crime-detecting questions that create little or no inconvenience to the arrestee, even if such queries are unrelated to the purpose of the stop and are unsupported by any suspicion."); *United States v. Childs*, 277 F.3d 947, 954 (7th Cir. 2002) (en banc) ("Questions that hold potential for detecting crime, yet create little or no inconvenience, do not turn reasonable detention into unreasonable detention."). Asking about the presence of weapons is also a routine and permissible step during traffic stops to ensure officer safety. *See Rodriguez v. United States*, 135 S. Ct. 1609, 1615–16 (2015). When Dominique responded by stating that Mr. Brown had a firearm in the car, less than six minutes had elapsed since the stop began. That was also only seconds after the officers learned that Dominique only had a learner's permit, and less than four minutes after they began leading Mr. Brown away from the car. That brief period of time was reasonable in relation to the purpose of

7

the stop, particularly since Dominique could not have legally driven away on her own, so the Court finds that Dominique was not unlawfully detained at that time. *See Fadiga*, 858 F.3d 1063; *United States v. McBride*, 635 F.3d 879, 882–83 (7th Cir. 2011).

Accordingly, the officers were entitled to rely on Dominique's statements in support of probable cause, and that probable cause authorized a warrantless search of the car. Therefore, the Court denies Mr. Brown's motion to suppress as to the search of the car.

**B.      Search of the Cell Phone**

Mr. Brown next argues that the search of his cell phone pursuant to a warrant was unlawful. Mr. Brown first argues that the search of the cell phone should be suppressed because the cell phone was discovered through an unlawful search of the car, but the Court has found that the search was lawful. And because officers had seen pictures posted on social media sites of Mr. Brown with firearms, it was reasonable to believe that the cell phone would contain evidence of his unlawful possession of firearms, so the seizure of the phone was lawful as well.

Mr. Brown also attempts to argue that the search warrant was invalid, but his arguments in that respect are not substantial. Mr. Brown's briefs accused the state prosecutor of signing a blank affidavit and having someone else fill in the supporting facts, but this accusation is bereft of support. At the suppression hearing, the state prosecutor testified as to how he electronically completed the warrant application, and Mr. Brown has given no reason to disbelieve that testimony, so the Court does not find that the warrant was invalid on that basis.

Mr. Brown further argues that the warrant was invalid because the affidavit contained a falsehood and omitted material information. This argument arises under *Franks v. Delaware*, 438 U.S. 154 (1978), under which evidence will be suppressed if officers procure a warrant by intentionally or recklessly making false statements that are necessary to a finding of probable cause, or by intentionally or recklessly omitting such information. *See also United States v.*

8

*Robinson*, 546 F.3d 884, 887–88 (7th Cir. 2008). Suppression is not warranted, though, "if, when material that is the subject of the alleged falsity or reckless disregard is set to one side, there remains sufficient content in the warrant affidavit to support a finding of probable cause." *Franks*, at 171–72.

Mr. Brown's briefs argued that the warrant was invalid because it failed to disclose that the cell phone was seized through an illegal search, but the Court has already rejected the factual premise for that argument. At the hearing, Mr. Brown also argued that the warrant included a falsehood, in that it identified the item to be searched as a cell phone "recovered from [the] possession of Presley Brown," when in fact he had tossed the cell phone into the car before the officers seized it. However, the very next page of the affidavit makes that clarification, stating: "In the course of taking Brown into custody, he was observed to toss a white cell phone back into the car, where it was located by officers." Nor would any imprecision in this respect be material to a finding of probable cause: the phone would be no less likely to contain evidence of Mr. Brown's offense if officers saw him toss it into the car as they were arresting him than if they took it from his hand. The pertinent facts in either event are that the officers observed Mr. Brown in possession of the phone immediately prior to his arrest, and then seized it. Thus, there is no basis to suppress the search of the phone under *Franks*. Accordingly, the Court denies Mr. Brown's motion to suppress as to the search of the cell phone.

**C.   Search of the House**

Finally, Mr. Brown seeks to suppress evidence found through a search of Dominique's house. After the traffic stop, officers transported Dominique to the Metro Homicide Unit offices, where they questioned her about Mr. Brown. During that questioning, Dominique admitted that a picture showing Mr. Brown with a firearm was recently taken in her house. A detective then said that he would like to search the house, and Dominique signed a form consenting to the search. A

number of officers conducted the search that evening and found a variety of contraband, including an AK-47 rifle, a pistol, and ammunition. Mr. Brown seeks to suppress that evidence, arguing that Dominique's consent was not valid and that officers thus lacked a lawful basis to conduct the search. The Court agrees.

The Court first finds that Mr. Brown does have standing to challenge the search of the house. As previously noted, Fourth Amendment rights are personal rights that cannot be vicariously asserted. *Rakas*, 439 U.S. at 133–34. Thus, to contest a search under the Fourth Amendment, a defendant must have "a legitimate expectation of privacy in the area searched." *Gardner v. United States*, 680 F.3d 1006, 1010 (7th Cir. 2012). This includes both subjective and objective requirements, meaning the defendant must actually hold an expectation of privacy, and it must be one that society recognizes as legitimate and reasonable. *United States v. Figueroa-Espana*, 511 F.3d 696, 704 (7th Cir. 2007). The Supreme Court has held that "in some circumstances a person may have a legitimate expectation of privacy in the house of someone else." *Carter*, 525 U.S. at 89. For example, "an overnight guest in a home may claim the protection of the Fourth Amendment, but one who is merely present with the consent of the householder may not." *Id.* at 90; *Minnesota v. Olson*, 495 U.S. 91, 96 (1990) (holding that an individual's status as an overnight guest in a home is sufficient to create a legitimate expectation of privacy). In assessing whether an individual has a legitimate expectation of privacy in a home, courts look to a number of factors, including the purpose, duration, and frequency of their visits, their connection to the householder, and their degree of acceptance into the household. *Carter*, 525 U.S. at 90.

Here, the Court finds that Mr. Brown did have a legitimate expectation of privacy in the home.[4] To begin with, both Mr. Brown and Dominique testified that he was a regular overnight guest at the home, and that he had slept there each night over the previous month. On its own, that testimony is worth little, as both Mr. Brown and Dominique have very serious credibility problems given the inconsistencies with their own previous statements to the police and in their phone calls with each other. However, there is enough corroboration through other evidence and through other prior statements by Dominique that the Court finds at least that Mr. Brown was a regular occupant at the home and had a legitimate expectation of privacy there.

Though Dominique initially told officers that she did not know where Mr. Brown lived and had only recently met him, she later made a number of admissions that were more consistent with her testimony at the suppression hearing. Towards the end of her interview on the first night, Dominique admitted that she and Mr. Brown had been together for five months, not only the few weeks she had previously described. In addition, during her interview the following day, Dominique admitted that Mr. Brown had been regularly selling marijuana at her house; that he had been doing so for several months; and that he had paid one of her bills with money she knew to be drug proceeds. Unlike her other previous statements that tried to deflect accountability, these statements were against Mr. Brown's and her own interests, and thus carry greater credibility. They also indicate that Mr. Brown was routinely present at the home, though perhaps not continuously. Dominique also said that when Mr. Brown would have his friends over to the house, she would either go into her own room or would leave the house, indicating that Mr. Brown had a degree of autonomy within the house. She also noted that on one occasion, after she

---

[4] Also, though the government expressly contested Mr. Brown's standing to challenge the search of the car, it did not argue that Mr. Brown lacked standing as to the home.

and Mr. Brown had a fight, she grew concerned when he left and did not return to the home that night, which further indicates that he regularly stayed there. Moreover, Detective Wiley testified that during the search of the home, he found evidence of domain for Mr. Brown, including an envelope containing a number of personal letters written to Mr. Brown and legal materials relating to previous criminal charges. In light of that evidence showing Mr. Brown's close relationship to Dominique and his regular presence at her home over a number of months, including overnight visits, the Court finds that Mr. Brown had a legitimate expectation of privacy in the home. *See Olson*, 495 U.S. at 95–100.

The Court must therefore determine whether the search of the home was lawful. The Fourth Amendment generally requires a warrant based on probable cause before officers may search a home, but one exception to that rule is when an occupant gives consent to a search. *Fernandez v. California*, 134 S. Ct. 1126, 1131–32 (2014); *Georgia v. Randolph*, 547 U.S. 103, 106 (2006). Consent by only one occupant can suffice, even if other individuals possess an expectation of privacy in the premises. *Fernandez*, 134 S. Ct. at 1129. However, the consent must be voluntary, and the government bears the burden of establishing free and voluntary consent. *United States v. Richards*, 741, F.3d 843, 847–47 (7th Cir. 2014); *United States v. Strache*, 202 F.3d 980, 984 (7th Cir. 2000). The voluntariness of consent is determined based on the totality of the circumstances, and courts have identified a number of criteria to consider in making that determination. *Schneckloth v. Bustamonte*, 412 U.S. 218, 227 (1973); *Richards*, 741 F.3d at 848. The parties here primarily focus their arguments around those factors.

Critically, however, "consent given during an illegal detention is presumptively invalid." *United States v. Johnson*, 427 F.3d 1053, 1056 (7th Cir. 2005); *United States v. Cellitti*, 387 F.3d

618, 622 (7th Cir. 2004).[5] Thus, "any evidence discovered in a subsequent search is inadmissible unless the taint of the illegal conduct is somehow dissipated." *Johnson*, 427 F.3d at 1056. On that point, the government bears a "heavy burden" of establishing that the consent is sufficiently attenuated from the illegal activity, considering the time elapsed between the illegal conduct and the discovery of the evidence; the existence of intervening circumstances; and the nature of the official misconduct. *United States v. Jerez*, 108 F.3d 684, 695 (7th Cir. 1997); *see also Cellitti*, 387 F.3d at 623. However, "[w]hen consent to search is given by a person who remains illegally detained, the government is unlikely to meet its burden of showing that the consent was sufficiently attenuated from the illegality." *Cellitti*, 387 F.3d at 623.

First, the Court finds that Dominique was detained at the time she gave her consent. The government conceded that much upon questioning during its closing argument. The detective who conducted the questioning of Dominique and procured her consent also testified that Dominique was detained. Those concessions are consistent with the evidence. An individual is considered to have been seized if, "in view of all of the circumstances surrounding the incident, a reasonable person would have believed that [s]he was not free to leave." *Michigan v. Chesternut*, 486 U.S. 567, 573 (1988). Here, after Dominique told the officers that there was a firearm in the car, she was told—not asked—that officers needed to take a statement from her. The officer also told her that he would not allow her to make a phone call at that time, and she was led to and placed in the back of a police car. In the car, the officer began telling her that she was free to

---

[5] The reason the legality of Dominique's detention matters here but not relative to the search of the car is that if her consent to a search of the home was invalid, then officers lacked a lawful basis to search it, in which case the search would have violated Mr. Brown's Fourth Amendment rights. *Cellitti*, 387 F.3d at 621–22. By contrast, the officers did have a lawful basis to search the car—probable cause—and Mr. Brown's argument there is only that this lawful basis to search was the fruit of the poisonous tree of a separate violation of someone else's rights. *Washburn*, 383 F.3d at 643.

leave and was not being detained. However, he immediately retracted that statement and told her that she was being detained, though he assured her that she was not going to be taken to the jail. Dominique was then transported to the station, where she was placed by herself in an interrogation room after a detective took her purse and cell phone away from her. After confirming Dominique's contact information, the detective began the interview by reading Dominique her *Miranda* rights. At no time was Dominique told that she was free to leave or asked whether she wished to speak to the officers voluntarily. And again, Detective Wiley testified that Dominique was detained during this time.[6]

Under those circumstances, a reasonable person would not have believed that they were free to leave, so Dominique was detained at the time she gave consent. It follows, then, that Dominique was unlawfully detained, as the government has offered no justification for her detention at that point. The traffic stop had concluded hours before and did not justify Dominique's continuing detention. The government does not suggest that officers had probable cause or reasonable suspicion to believe that Dominique was involved in any unlawful activity, either. Accordingly, the Court finds that Dominique was unlawfully detained at the time she signed the form consenting to a search of her house.

That finding triggers the presumption that Dominique's consent was invalid, meaning that the government bears the burden of establishing that her consent was sufficiently attenuated from the detention. *Johnson*, 427 F.3d at 1056–57; *Cellitti*, 387 F.3d at 622–23. The government has not attempted to make that showing, nor does it appear that it could do so. Since Dominique

---

[6] Prior to her consent, officers also accompanied Dominique to pick her mother up from work, and she was driven there and back in a police car, without having left the custody of the officers. Dominique only had a learner's permit, though, so that factor does not cut in either direction, as she could not have driven to pick up her mother on her own.

was unlawfully detained at the time she gave her consent, there was no passage of time or intervening event that attenuated the effect of the unlawful detention. *Johnson*, 427 F.3d at 1057 ("[T]he unlawful seizure was ongoing when Johnson voiced his consent, foreclosing the possibility that the consent was sufficiently attenuated from the unlawful conduct as to purge the taint."); *Cellitti*, 387 F.3d at 623 ("[The third party's] consent was given while she was still in custody because of the illegal arrest and there was no intervening event of significance. Under these circumstances, we conclude that her consent to search the Buick was tainted by her illegal arrest and was therefore invalid."). And though the Court agrees with the government that the officers and detectives were courteous and amiable with Dominique throughout the encounter, that does not change the lawfulness of the detention.

Therefore, the Court finds that Dominique's consent to a search of the home was not valid, because it was given during an unlawful detention. Accordingly, the fruits of that search must be suppressed,[7] so the Court grants Mr. Brown's motion in that respect.

### III.  CONCLUSION

For those reasons, the Court DENIES the motion to suppress [DE 5] as to the searches of the car and the cell phone, but GRANTS the motion as to the search of the house.

SO ORDERED.

ENTERED:  July 19, 2017

/s/ JON E. DEGUILIO<br>Judge<br>United States District Court

---

[7] This holding would have no effect at sentencing, should this case reach that stage, as "the exclusionary rule does not apply at criminal sentencing." *United States v. Sanders*, 743 F.3d 471, 472 (7th Cir. 2014).